

# THE ATTORNEY GENERAL
## OF TEXAS

AUSTIN, TEXAS 78711

WAGGONER CARR
ATTORNEY GENERAL

February 21, 1966

Honorable Henry Wade          Opinion No. C-619
District Attorney
Records Building              Re: Whether a referral
Dallas, Texas                     selling plan
                                  constitutes a
Dear Sir:                         lottery.

By your recent letter you request an opinion of this office as to whether a certain referral selling plan constitutes a lottery. The contract in question is called a "representative purchasing commission agreement" and the facts and circumstances by which it is utilized are briefly summarized from various instruments, documents and memoranda furnished by your office. Its purpose is to promote sales through the seller's customers by promising them something for nothing, as hereinafter related. In substance, it is simply a chain referral selling scheme by which a built-in vacuum cleaning system is sold to a purchaser, called the seller's "Representative," for a stipulated money consideration and upon the further consideration and inducement that the purchaser would make money and, in effect, acquire the system for nothing through the use of a long term conditional sales contract.

As part of the transaction, the representatives purchasing commission agreement is executed. By this, the purchaser would furnish the selling company a list of qualified prospective purchasers. For each sale to any one so referred, the purchaser would receive a commission of $50. A further pyramiding of $50 commission is evidenced in paragraph four of the agreement, supra, whereby the selling company agrees not only to pay the initial purchaser representative $50 for each name submitted by him who becomes a purchaser representative, but also to pay the initial purchaser representative an additional $50 for each name subsequently submitted by the purchasers "at the time they too become an equipment owning Representative Purchaser."

Such schemes operating on the referral plan appear to be designed to lead gullible prospective purchasers to believe that they can obtain the product sold without cost, or for nominal cost, by receiving payments from the promoters as commissions on items sold to referred customers and customers of such referral customers ad infinitum.

It further appears from the mode of operation of this scheme that the selling company's agent salesman, in contacting purchasers, represents that he could thereby "make some extra money" and "there will be no money out of your pocket." Since under the plan the purchaser was absolutely, under all contingencies, obligated to purchase the vacuum cleaner system, the purchaser is thus lead to believe that the commissions to be earned by him in referring prospective purchasers would be at least sufficient to cover his purchase price.

Under the contract, the purchasers have no control over the general operation after they submit the names of prospective referrals. Their mere act of supplying names of home owners is the only initiative, foresight or skill contributed, and the acts of subsequent purchasers in submitting names require no skill whatever and is subject to no control whatever by the initial purchasers. The skill of the selling company's agent who actually pushes the sales is not relevant under the authorities hereinafter cited. The element of chance from a saturated market through the principle of geometrical progression appears to be inherent in the plan. It is further made to appear that one of the aggrieved purchasers performing the contractual agreement, and whose name had been furnished to a salesman agent by a previous purchaser, nevertheless received nothing while binding himself to pay $1,086.48 over a three year period and complains that the scheme constituted a lottery.

We are advised that the Federal Post Office Department regards such a plan as an endless chain scheme, the operation of which conflicts with the Postal Lottery and Fraud Laws, 18 U.S.C. 1302, 1341, and all matters relating thereto being non-mailable under those laws.

The written agreement entered into and signed by both

parties as a part of the transaction in selling the vacuum cleaning system, which later is attached to the purchaser's home and upon which he also executes a mortgage for security, a prerequisite to becoming a "qualified prospect," reads:

1. Company hereby retains the services of representative for a period of thirty-six (36) consecutive months from the date hereof in the capacity of equipment owning Representative upon the terms and conditions hereinafter set forth.

2. Representative shall submit to company the names of individuals considered by Representative to be qualified prospective purchasers of (name of product) in active sales areas covered by Company. Each name so submitted shall be date stamped by Company when received.

3. Company shall pay Representative as earned commission the sum of Fifty Dollars for each individual, whose name is submitted by Representative, who thereafter becomes a qualified equipment owning Representative for (name of company).

4. (Name of company) shall pay Representative as earned commission the sum of $50.00 for each name subsequently submitted by the individuals referred to in paragraph 3 at the the time they too become an equipment owning Representative Purchaser. Representative Purchaser agrees to render assistance, time, skill and effort to Company by contacting the qualified purchaser herein referred to.

5. A qualified prospect is as follows:

   a. Prospect must own or be buying the home in which equipment will be installed. No Renters or Lessors.

b.   Prospect must be acceptable
     to (name of company).

6.   In the event two Representatives submit
     the same prospective new purchaser's name,
     the Representative directly responsible
     for the appointment on which the enrollment
     is made shall be entitled to the benefits,
     provided the prospective purchaser is
     accepted.

7.   This Agreement shall become effective
     upon completion of the following conditions:

     a.   Signed by an authorized agent of
          (name of company) and enrolled
          purchaser;

     b.   Acceptable to home office of
          (name of company).

8.   The commission payments herein provided
     shall be the sole and only compensation
     due Representative Purchaser from (name
     of company) and it is expressly under-
     stood that in accepting this contract
     Representative is acting as an indepen-
     dent contractor and shall pay all local,
     city, county, state and federal taxes
     on any commission received by him and
     shall hold (name of company) harmless
     for any of these taxes.

9.   This agreement shall be valid for three
     years from date hereof, but may be termi-
     nated by reason of fire, flood, strikes,
     lockouts, acts of God, war, rules and
     regulations by the Federal, State or
     local governments, repossession, con-
     version or other circumstances beyond
     the control of (name of company).

10.  It is further understood and agreed

Hon. Henry Wade, page 5  (C-619)

> that payment of compensation hereunder
> shall not in any way affect the obliga-
> tion of the Representatives as set forth
> by the terms and conditions of the con-
> tract for the purchase of equipment.

> 11.  That this agreement expresses the
> complete understanding of the parties here-
> to.  No authority is given to any person to
> alter, amend or change any of provisions
> hereof.

In Texas, the term "lottery" is said to have no technical signification in the law, and since the prohibitory statute (Art. 654, Vernon's Penal Code) fails to provide a definition, its meaning must be determined from popular usage and the common law, with due consideration to the public policy under-lying the authorities.  37 Tex.Jur.2d 493, Lotteries, Sec. 1.

It is now settled in Texas that a lottery is composed of three elements:

> (1)  A prize or prizes

> (2)  The award or distribution of the
> prize or prizes by chance; and

> (3)  The payment either directly or
> indirectly by the participants
> of a consideration for the right
> or privilege of participating.

City of Wink v. Griffith Amusement Company, 100 S.W.2d 695 (Tex.Sup. 1936); Brice v. State, 156 Tex.Crim. 372, 242 S.W.2d 433 (1951); and State v. Socony Mobil Oil Company, 386 S.W.2d 169 (Tex.Civ.App. 1964, error ref., n.r.e.).

In the facts presented, it affirmatively appears that the money to be received by the Representative as "an earned commission" would constitute the prize, or the first element. The third element, the payment of consideration by the participants for the right to participate, also clearly appears as a part of the referral selling plan agreement. The consideration for the opportunity to receive the "prize" would be, in part, the purchase price for the vacuum cleaning system. The second element, the distribution of the prize by chance,

requires a closer analysis in the light of the decisions as to whether the dominating element of the entire scheme was that of chance, or that of skill, judgment, or ingenuity, 54 C.J.S. 846, Lotteries, Sec. 2b(2), and cases cited. If the plan or game depends entirely on skill, it is not a lottery although prizes are offered for the best solution. Boatright v. State, 118 Tex.Crim. 381, 38 S.W.2d 87 (1931). If chance predominates over skill or judgment and permeates the whole plan, a lottery is established. Sherwood & Roberts-Yakima, Inc. v. Clyde G. Leach, 67 W.D.2d 618, 409 P.2d 160, (Wash.Sup. 1965).

Under the authorities, the courts must look to the substance of the referral selling plan or scheme rather than to its form. In New v. Triband Sales Corporation, 19 F.2d 671, the court, cognizant of the necessity to view substance rather than form, quoted the rule from an earlier decision with approval as follows:

"As was observed by the Supreme Court of North Carolina in State v. Lipkin, 169 N.C. 265, 84 S.E. 340, L.R.A. 1915 F. 1018, Ann.Cas. 1917D, 137, 'no sooner is a lottery defined, and the definition applied to a given state of facts, than ingenuity is at work to evolve some scheme of evasion which is within the mischief, but not quite within the letter, of the definition . . . The Court will inquire, not into the name, but into the game, however skillfully disguised, in order to ascertain if it is prohibited, or if it has the element of chance. . .'" (Emphasis added)

The Court in the New case, infra, then proceeded to hold that where one depended upon the acts of others over whom the participant had no control, the necessary element of chance in the elusive referral selling plan was supplied.

Again, in State ex rel. Evans v. Brotherhood, 41 Wn.2d 133, 247 P.2d 787 (1952), the court looked into the substance of the plan:

"The scheme or plan involved, rather than any mechanical devise employed, constitutes the gist of the question, and determines whether a particular operation constitutes a lottery."

The referral selling plan here presented is substantially similar in all material respects to the one passed upon by the Supreme Court of the State of Washington in Sherwood & Roberts-Yakima, Inc., v. Leach, 67 W.D.2d 618, 409 P.2d 160, (1965), which held that the plan constituted a lottery. The Court had no difficulty finding the three essential elements of a lottery present, and made a skillful analysis of the element of chance inherently involved in the transaction, and which necessarily predominated over skill or judgment. We quote in part from pages 622-624 of the unanimous decision by the Supreme Court:

> "Here, as part of a general operation, respondents may obtain commissions (prize) and they have agreed to pay the purchase price of the equipment (consideration) in an effort to get that prize. The next question is whether that effort is based on chance.

> "In State v. Lipkin, 169 N.C. 265, 271, 84 S.E. 340 (1915) it was said:

>> 'The Court will inquire, not into the name, but into the game, however skillfully disguised, in order to ascertain if it is prohibited, or if it has the element of chance. It is the one playing at the game who is influenced by the hope enticingly held out, which is often false or disappointing, that he will, perhaps and by good luck, get something for nothing, or a great deal for a very little outlay. This is the lure that draws the credulous and unsuspecting into the deceptive scheme, and it is what the law denounces as wrong and demoralizing.'

> "(4) Chance within the lottery statute is one which dominates over skill or judgment. The measure is a qualitative one; that is, the chance must be an integral part which influences the result. The measure is not the quantitative proportion of skill and chance in viewing the scheme as a whole. State ex inf. McKittrick v.

Globe-Democrat Publishing Co., 341 Mo. 862,
110 S.W.2d 705, 113 A.L.R. 1104 (1937).

"(5) Appellant argues that skill or judgment is factually the dominant factor, i.e., the factors determining whether a commission will be paid are the judgment of respondents used in selecting names they refer and the skill of the Lifetone salesman. But we are only concerned with the skill or judgment of respondents; the skill of the Lifetone salesman is irrelevant. Assuming that respondents in fact used skill or judgment in selecting the referrals, the trial court properly held that chance permeates the entire scheme. The court found that respondents took a chance that the referrals might not be interested; that the salesman might not adequately make his presentation; that the referral might have already been referred by someone else; that the market might be saturated; and that the salesman might not even contact the referral. In addition, the trial court noted that respondents have no control over the general operation after they gave the names of referrals. . . . Appellant argues that the want of control is not a legitimate factor to consider. This argument is tenuous.

"The lack of control feature in referral selling is much broader than that designated by the trial court. It is inherent in referral selling that purchasers such as respondents be without control. Sooner or later, the market, unknowingly to the purchasers, will become saturated. This principle is the same as in the chain letter scheme. The case at hand is a classic example.

"The Lifetone salesman told respondents that they could get something for nothing through the referral selling scheme. Respondents are obligated to pay $1,187.28 for equipment costing $225.32. For ease of demonstration,

respondents must earn 12 commissions of $100
each in order to get, as promised, something
for nothing.  This means that 12 of respondents'
referrals must purchase as respondents did; they,
in turn, to get something for nothing, must find
12 more people to purchase, and so forth, as
follows:

|           | Number of Purchasers |
|-----------|---------------------:|
|           | 1                    |
| 1st round | 12                   |
| 2nd round | 144                  |
| 3rd round | 1,728                |
| 4th round | 20,736               |
| 5th round | 248,832              |

"Soon the scheme will run itself out; the
market will become saturated.  Here, Lifetone
made its first sale in May, 1963, and its last
sale in October, 1963.  The respondents entered
the picture in September.  They gave the Lifetone
salesman approximately 60 names at that time,
and they never received a commission.  In fact,
only $14,900 in commissions were paid in the
Yakima area, while the total number of sales
was 137, totalling $129,947.04 (without finance
charges).

"Respondents took a chance on whether they
could get something for nothing.  This chance
permeates the entire scheme of referral selling.
This court holds that the referral selling scheme
is a lottery."

The Attorney General of Massachusetts, in a 1964 opinion
held that such a referral selling plan as here involved
constitutes a lottery and contains the three essential ele-
ments above discussed.  This opinion reviews the decisions
in the light of public policy and hold that those who place
an order for an article in the hope of getting future com-
missions to offset the purchase price, pay a consideration
for a prize, the winning of which is based upon chance.

The opinion holds:

> "Whoever sets up or promotes a plan by
> which goods or anything of value is sold to
> a person for a consideration and upon the
> further consideration that the purchaser
> agrees to secure one or more persons to
> participate in the plan by respectively
> making a similar purchase or purchases
> and in turn agreeing to secure one or more
> persons likewise to join in the said plan,
> each purchaser being given the right to
> secure money, credits, goods or something
> of value, depending upon the number of
> persons joining the plan, shall be held
> to have set up and promoted a lottery. . . ."

We therefore hold that the referral selling plan in question constitutes a lottery in Texas within the meaning of the common law, popular usage and Article 654, Vernon's Penal Code. No real skill is contributed by the "Representative," but the element of chance predominates and permeates the plan as an inherent component thereof.

## S U M M A R Y

A chain referral selling plan, containing the elements of a prize, the award thereof by the element of chance, predominates over skill and being inherent from lack of control by the participants taking the chance, and the giving of consideration for the opportunity to win a prize, constitutes a lottery in Texas within the meaning of the common law, popular usage, and Article 654, Vernon's Penal Code.

Yours very tuly,

WAGGONER CARR
Attorney General

By: ~~Kerns B. Taylor~~
Kerns B. Taylor
Assistant

KBT:cf

APPROVED:
OPINION COMMITTEE

W. V. Geppert, Chairman
George Gray
Vince Taylor
Gordon Cass
H. Grady Chandler

APPROVED FOR THE ATTORNEY GENERAL
BY:  W. B. Wright